## Warren *versus* Steer.

1. The court cannot anticipate the defence to an action, and will not exclude a witness until his incompetency appears. A witness was permitted to testify until his incompetency as a witness appeared, when the court struck out his testimony and instructed the jury to disregard it entirely. *Held*, not to be error.

2. A witness incompetent by reason of interest, the assignor of the thing or contract in action being dead, becomes a competent witness by the removal of that interest.

3. The presumption that a trust resulted to one at the time of purchasing a lot of land, arising from the payment of the purchase money, may be overcome by parol evidence of his intention otherwise at the time of the purchase. Declarations made afterwards, and not bearing upon his intention at the time of the purchase, cannot affect the title.

January 4th, 1886. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas, No. 2, of *Philadelphia county:* Of July Term, 1884, No. 166.

Ejectment brought by Edward J. Steer against Henrietta Warren and David K. Large, guardian of the estate of Annie Warren, a minor, for a certain lot of land in the City of Philadelphia.

Plea, not guilty.

The following are the facts of the case as they appeared on the trial before HARE, P. J.

The plaintiff claimed, through a deed from Henry Davis and Mary, his wife, executed after the death of William J. Warren. The defendants claimed under William J. Warren, who held by a deed which they alleged Davis and wife had made to him; they also claimed that Mrs. Davis was his trustee under the following circumstances: In 1854, William J. Warren informed Henry Davis, who had married his sister, Mary, that there was some dispute between him and Richard W. Steel, in relation to a lot that was to be sold that night at the Exchange. He requested him to be present at the sale

[Warren v. Steer.]

and bid it in, and promised if he would do so he would have the deed made to his sister, the wife of Davis, and give it to her. Davis asked if there was anything wrong about it, and was assured by Warren that there was not, and that thus the present for his sister could be best secured; whereupon he assented, and duly made the purchase. The money was paid by Warren, and at his order the deed was made to Mary Davis. Davis testified that shortly after the deed was made Warren brought it to his house in Camden, laid it upon the bureau, staid several hours, and as he was about to leave said to his sister that he would take the deed back with him and take care of the property for her. Mrs. Davis and her husband soon after departed from Camden for Rio Grande, in New Jersey. He stated to them, and to others afterwards, that his sister owned the lot, that he was collecting the rents for her, and that he proposed when the rents had accumulated to use them in paying for a building on the ground, so that she might have something to fall back upon. He had the property duly registered as hers in the Registry Bureau of the Survey Department of Philadelphia, and there was thus secured to her as owner the advantages created by the several Acts of Assembly relating to that department.

At the close of July or beginning of August, 1872, Warren visited his sister at her home in New Jersey. His plan then was, instead of erecting a substantial dwelling for her on the lot, in the place of the frame building which was there, to avail himself of an opportunity to sell the land and give his sister the money. She was quite aged, being now about eighty-four. He discussed the matter with Mrs. Davis and her husband. The former was averse to a change in the arrangement, and the latter declined to act; but the views of all were in accord by the next morning, upon his assurance that the transaction was to secure the money for Mrs. Davis; and then she and her husband gave him an instrument which cannot be described, since it was lost by Warren on his reaching his home. It may have been a letter of attorney, authorizing a sale. It was not, according to the plaintiff's proofs, a deed to Warren in fee simple, but it gave him some personal power, the words, "heirs and assigns," having been intentionally omitted. The conjecture that this was a letter of attorney flows from the narration of what occurred on the morning referred to. Warren visited two neighbors of his sister, Samuel and Susan Izzard, before breakfast, and told them, in the course of his conversation, that he had come from Philadelphia to obtain a paper from " Mary Anne," that he might sell her lot for $3000. "He said that he thought he would come down and get the deed, and sell the property and give her the money that he got; the $3000

that he got for it; that it would do her more good than the property." Shortly after his return to Philadelphia he saw Henry Davis there, and told him that the paper was lost. " He hollowed at me," said Davis : ' Henry,' says he, ' the deed that I had at home for you, and one other deed, were lost.' Whether it was so, or not, I know not; but that is what he told me. The deed from Mr. Steel and this deed was together in his pocket, and he hung up his coat in the entry, and when he got up in the morning both deeds were gone, and he says to me, ' Henrietta has taken them out.' " . . . . . Q. Who had taken them out? . . . . . " Henrietta, his woman that he lived with." . . . . . " He said, ' Never mind, it will not make any odds; it will only make the other deed the better, the stronger.' " Nothing of moment occurred after this till Warren's death.

On the trial, May 19th, 1884, the plaintiff called on the defendants to produce the deed of Steel and wife to Mary Ann Davis, dated February, 18th, 1854, acknowledged but not recorded. Objection was made to the deed being offered in evidence, unless possession under the deed was shown in Mrs. Davis. The plaintiff was then called in his own behalf, and under objection and exception of defendants, he testified that he had been informed by William J. Warren that Mrs. Davis went into possession of the lot after February, 1854; that he, William J. Warren, acted as her agent, because she lived out of Philadelphia. On cross-examination it appeared that Mr. Warren was dead, and that the defendants were Mr. Warren's widow and heir. (First assignment of error.)

Defendants then moved to strike his testimony out, which was refused: but subsequently the judge, in his charge to the jury, directed them to disregard this evidence.

The deed, Steel to Davis, was then admitted in evidence, under exception.

Plaintiff offered a deed from Mary Ann Davis and her husband, Henry Davis, dated May 6th, 1875, to Edward J. Steer, the plaintiff, which was admitted under objection and exception.

He also called Samuel Izzard, a neighbor of the Davis's in New Jersey, who testified, under objection and exception, that he visited Warren's house but once, and then took a walk with Warren, and, while going along one of the streets of the city of Philadelphia, Warren said to him, while pointing to a frame house: " This house is Mary Ann Davis's; I bought it and made her a present of it." He (Warren) further said he got Davis to bid it in for him. But the witness could give no idea when this walk and conversation took place; whether it was

fifteen years before or not; he said he could not tell what street the house was on, or anything about it.

.After offering the writs in this case plaintiff closed, and defendants moved for a nonsuit, which motion was overruled, and defendants then called witnesses to show that Mr. Warren had owned property adjoining and around the property in question; had taken possession of this lot; built a frame carpenter shop upon it in 1855; had leased it in his own name; paid the taxes; exercised all acts of ownership; and had never done anything that indicated that he was acting as agent for Mary Ann Davis or anybody else until he died in 1874. They further called a witness, who testified that, on the day that Warren was buried, Henry Davis and Mary Ann Davis had told him, the witness, that Warren had bought this lot through Davis at the Exchange; took title in her, Mrs. Davis's, name; and that when Mrs. Davis was sick, they had made a new deed to him.

They also called a witness who had been clerk to Judge MARCY of the Court of Common Pleas of Cape May county, New Jersey, and testified to the signature of Judge MARCY; and his (the witness') own writing in the acknowledgment to the deed of 1871; and that the alterations in the acknowledgment had been made at Judge MARCY's request. After which defendants offered in evidence the deed of November 3d, 1871, Mary Ann Davis and Henry Davis to Wm. J. Warren, and rested.

The plaintiff then called, in rebuttal, Henry Davis, who was objected to as being an incompetent witness. He then put in evidence a deed dated March 31st, 1884, from himself to Davis and wife, releasing them from all liability upon their covenants in their deed to him. The court held Davis a competent witness and permitted him to testify. (Fourth assignment of error.)

Davis testified, under objection and exception, that Warren had declared to him and his wife that the lot in question was a gift from him to Mary Ann Davis, his sister, and that he, Warren, held the premises for her. (Fifth assignment of error.)

Davis also under objection and exception denied the execution of the deed, Mary Ann Davis, wife of Henry Davis, to William J. Warren, dated November 3d, 1871, for the lot in question. (Sixth assignment of error.)

The defendants presented, inter alia, the following points:

3. If the jury believe that the premises in question were purchased by William J. Warren with his own money in 1854, and after said purchase he entered into possession and remained in possession until his death in 1874, holding the prop-

[Warren *v.* Steer.]

erty and premises as his own, the verdict should be for the defendants.

9. If William J. Warren went into possession of said premises in 1854, and held such possession as his own, openly, notoriously and adversely until his death in September, 1874, and his widow and heir have held the same kind of possession since that time, or until the bringing of this suit, then the verdict should be for the defendant.

In answer to these points the court said that such possession as was described in the third point was evidence for the defendants, and if notorious and adverse, as stated in the ninth point, conclusive in his favor, and a defence to the suit. If, however, it was coupled with an admission that the right was in Mrs. Davis, it would not be adverse or constitute a defence, though still evidence for the consideration of the jury. (Eleventh assignment of error.)

4. The payment of the purchase money for the said premises, if made by William J. Warren, was all that was needed to vest the ownership of the property in him, and the fact that he had the title put in the name of Mary Ann Davis would not have defeated Warren's right to possession or his ownership of the premises.

Answer. Declined. (Twelfth assignment of error.)

5. If William J. Warren paid the purchase money for said premises at the time of the conveyance from Richard W. Steel in 1854, and he (Warren) entered into possession of the premises, and remained therein until his death, then, although he took the paper title in the name of Mary Ann Davis, still the presumption is that he intended the property for himself, and in the absence of satisfactory evidence showing any contrary intent on the part of Warren, the verdict should be for the defendants.

Answer. I affirm that proposition, having told you already that if a man pays for land and puts the title in another and holds the deeds and takes the rent, then the presumption is that he is buying for himself and that he is the owner. But, as I have told you, if at the time of doing that he promises that party to whom the title was made that the property shall be his, and the party consents to take it on those terms, and if such language is used as is calculated to convey the idea that the person to whom the paper title was made was the absolute owner, and persons so understood the language, the presumption would not arise. (Thirteenth assignment of error.)

10. Under all the evidence in this case the verdict should be for the defendants.

Answer. Declined. (Fourteenth assignment of error.)

Verdict for the plaintiff and judgment thereon, whereupon

the defendants took this writ, assigning for error, *inter alia*, the admission of evidence and the answer of the court to these points, as above shown.

*Thomas R. Elcock, W. J. Budd* and *William Hopple, Jr.*, for plaintiffs in error.—The defendant in error rests his title upon the alleged gift of the premises made by Warren to his sister, under whom he (defendant in error) claims.

Upon the trial he was permitted to testify as to alleged admissions made by Warren to him some time after 1856, that Mrs. Davis was in possession of the premises through him (Warren).

Warren was the "assignor of the thing or contract in action," (Act of 1869). and, being dead, Steer was clearly incompetent to testify to the declarations made to him by Warren in his lifetime: Karns *v.* Tanner, 16 Sm., 297; Arthur *v.* King, 3 Nor., 525; Hess *v.* Gourley, 8 Id., 195; Waltman *v.* Herdic, 9 Id., 459; Ewing *v.* Ewing, 15 Id., 351; Fross' Appeal, 15 W. N. C., 534; Thomas *v.* Horlocker, 1 Dal., 14; Shaller *et al. v.* Brand, 6 Binn., 435.

It is submitted that Henry Davis was not a competent witness to testify to alleged declarations made to him by Warren in his lifetime in relation to the thing or contract in action, and that the release from Steer did not render him competent. Steer's deed from Davis and his wife is dated May 6th, 1875. Prior to that time he had full knowledge of the claim of the plaintiffs in error to the property; there was no consideration paid for it by him, and the deed was evidently made for the purpose of litigation against the plaintiffs in error. The deed and the release were merely colorable, and for the sole purpose of making Davis technically competent to testify.

Whilst one of the parties to a contract in litigation is denied the privilege of testifying, the policy of the law is to close the mouth of the other: Graves *v.* Griffin, 7 Har., 176; Cambria Iron Co. *v.* Tomb, 12 Wright, 387; Karns *v.* Tanner, 16 P. F. S., 297; Fross' Appeal, 15 W. N. C., 534.

Again, both he and his wife had a direct interest in maintaining Steer's title that was not affected by the release. Mrs. Davis was the trustee for Warren, or he was her agent for the property. If he was her agent, his estate is liable to account to her for the rents of the property prior to his death, and the plaintiffs in error since that time to the date of the conveyance to Steer, and the verdict in this suit in favor of Steer would be conclusive proof of such agency: Stub *v.* Lees, 7 Watts, p. 43; Cambria Iron Co. *v.* Tomb, 12 Wright, 387.

The fact that the property was paid for with the money of Warren is sufficient to establish *prima facie* a trust in his

favor; Lynch *v.* Cox, 23 Pa. St., 265; Bert's Ex. *v.* Graybill, 28 Id., 66; Barnet *v.* Dougherty, 32 Id., 371; Edwards *v.* Edwards, 39 Id., 369.

It is submitted that the Court erred in permitting Henry Davis to deny the execution of the deed of Mary Ann Davis, wife of Henry Davis, dated November 3d, 1871.

In McIldowny *v.* Williams, 4 Cas., 493, it was held that " a person having transferred by deed or assignment all his interest in the premises, could not afterwards be permitted by his own testimony to impeach or destroy the title thus conveyed."

The uncorroborated testimony of a single witness contradicting a writing, which writing is corroborated by plaintiff's testimony, is not sufficient to overthrow the written contract: Phillips *v.* Meily, Leg. Int., January 9th, 1885, p. 18.

*William W. Wiltbank* (*Henry Reed* with him), for defendant in error.—The resulting trust was attempted to be set up on the conversations of Henry Davis. He explicitly disproved a trust, and showed a gift by Warren to his sister. In order to render Steer incompetent as a witness, a *prima facie* case of resulting trust in Warren should have been established, and this was not done.

Again, the Act of April 22d, 1856, section 6, applied (Purdon Dig., page 930, pl. 14), so far as to put the defendants in the ejectment to affirmative and clear proof that Warren's possession was that of *cestui que trust.* The burden as to this was on them. Warren was in possession in one of two characters, as agent or as in his own right by operation of law. The plaintiff had shown by the testimony of Izzard (independently of Steer), that Warren held as the agent of the legal owner. The defendants did not meet this.

Henry Davis was a competent witness. He was not liable to Steer under his covenant in his and his wife's grant to Steer, because he was fully released by Steer, in that and every other behalf. (1.) He was establishing no claim of his own against the estate of Warren. And, in point of fact (2.) he was testifying against his interest, if we are to accept the present theory of the plaintiffs in error.

The declarations of Warren, made on the several later occasions to the Izzards, were not needed to establish the gift, while they were important in showing his agency, and the circumstances under which he desired a power of attorney from his sister to make the intended sale in 1872. And for this purpose, proof of them was competent.

"The party," said this court in Strimpfler *v.* Roberts, 18 Pa. St., 298, "who undertakes to establish a resulting trust by

parol evidence takes the burden of proof on himself. He claims an estate in land, not only without a deed, but in opposition to the written title. Records and deeds are not easily overthrown, as is manifest enough from the stringent rules which this court has often laid down in cases of parol sales. The whole doctrine of resulting trusts is a violation of the sound principles on which the Statute of Frauds is based, and ought not to be favored except when the trust originated in the bad faith of the nominal purchaser.

While it is true that an assignor, having passed away his interest, cannot deny that interest, nor impeach it in any way, it is entirely competent for one who is alleged to have made a given assignment, to show that he never did so.

The deed referred to, that of November 3d, 1871, was the deed of neither Henry Davis nor Mary Ann Davis.

Mr. Justice CLARK delivered the opinion of the court, May 17th, 1886.

This ejectment was brought to recover the possession of a lot of ground, situate on the east side of Eighteenth street, south of Wood, formerly in the district of Spring Garden, in the City of Philadelphia. Richard W. Steel, it is admitted, was in the year 1854 the owner of the ground in question; in that year Steel exposed the lot to sale by auction at the Public Exchange, and William J. Warren became the purchaser thereof, his brother-in-law, Henry Davis, bidding it in for him at the sum of $600 or $650. Warren, it is conceded also, paid the purchase money from his own funds, together with all the expenses of the conveyance, but took the title in the name of his sister, Mary Ann Davis, wife of Henry Davis. The defendants' contention is, that a trust resulted to William J. Warren as the source and origin of the consideration, and their claim is under him.

The plaintiff claims title under a conveyance from Mary Ann Davis, executed after the decease of William J. Warren, and dated 6th May, 1875.

As the case stood when Edward J. Steer was offered as a witness, he was clearly competent; when in the progress of the trial and before the testimony was closed, his incompetency appeared, his testimony was stricken out, and in the charge the jury was distinctly instructed to entirely disregard it. The learned court was not obliged to anticipate the defence, and could not exclude the witness until his incompetency appeared. The first assignment of error is therefore not sustained.

Neither Henry Davis nor his wife were parties to the suit, and after the execution of the release to them by Edward J.

Steer they had no interest in the result. The subject matter of the suit was the title and possession of real estate, and the action ejectment. The rule laid down in a large number of cases in this court, and recently declared in Fross' Appeal, 15 W. N. C., 543, that where one of the parties to a contract in litigation is, by death, denied the privilege of testifying in relation to it, the policy of the law will close the mouth of the other, applies to suits upon choses in action only; although it would be difficult, perhaps, to assign the reason for the distinction, a long line of cases show that the rule has never been held to apply to actions involving the title to real estate. Henry Davis was, therefore, not incompetent as a party to the suit, nor upon the ground of interest, or upon any rule of public policy. He was clearly competent prior to the passage of the Act of 1869, and that Act has not rendered any witness incompetent who was not so before its passage. The fourth, fifth and sixth assignments are therefore not sustained.

It is well settled as a general rule of equity, that where a purchaser of real estate pays the purchase money out of his own funds, as his own, taking the title in the name of another, the ownership of the money will draw to it an equitable interest in the land; he will be presumed to have bought for himself, and the beneficial title to the property will be in him. To this general principle there are well known exceptions, but the case in hand does not fall within them. It is not claimed that William J. Warren occupied any such relation to Mary Ann Davis, the nominee in the deed, as created any obligation on his part, moral or otherwise, to provide for her; although a sister, she must in this transaction be treated as a stranger: Edwards *v.* Edwards, 3 Wr., 369.

The intention of the parties at the time is the essential element, for if Warren paid the consideration as his own, and not for his sister, the beneficial title is his; his declarations afterwards made, and not bearing upon his intention at the time, cannot affect his title, or vest in his sister an estate, which, at the execution of the deed, was the estate of Warren himself.

Henry Davis is the only witness who testifies as to the circumstances attending the purchase of the property by Warren. He says that on the day of the purchase Warren came to his house in Camden, and said to him: " Henry, there is a lot in dispute between me and Mr. Steel;" the best of my knowledge, he said that they had a law suit about it and it went to court, and they could not collect the expenses off the lot; and he says: " It is to be sold at the Exchange to-night; I want you to come over and bid it in; if you will, I will give it to your wife and make her a deed for it." My brother-in-law

[Warren v. Steer.]

was a speculator, and I thought he might get me into trouble, and I says to him: "William, if there is nothing wrong in it I will do it." He states that he attended the sale at the Exchange as requested; that Warren stood beside him and urged him to bid, and that the property was knocked down to him at the sum stated.

The declarations of the parties subsequently made, and their conduct in the management and control of the property, are only material as they bear upon the intention of the parties at the time.

Davis testifies that in the same year (1854) he was about to remove to Cape May; that Warren brought the deed to his house in Camden, laid it upon the bureau; staid several hours; took tea with the family, and as he was about to leave, said:—"Mary Ann, as long as you are going to move away, I will take this deed, and take care of it for you, and if anything happens, I will see to it for you;" that he took the deed with him, and has since retained it in his possession; that he frequently spoke of the lot as "Mary Ann's lot," and at one time said, "I am going to put up a house on that lot; these two walls are mine adjoining, and all I have got to do is to pick into these walls, put in the joists, build the front and back, and I have got a house; I have almost collected rent enough to pay it." He further states, that at another time, whilst the witness resided at Rio Grande, Warren said in the presence of Mrs. Davis, that the lot was doing her no good, and if they were agreed he would sell it and give her the money. "When he came back again," says the witness, "he said: 'Mary Ann, I have come to get a deed for that property; I am offered $3,000 for it, and I want to sell it for you; I cannot unless you give me a deed.' I told him I could not or would not. Then he coaxed me to do it without any money or any valuation on it; he tried to coax me to do it. Says I, "William, I won't do it. It never was mine; it was my wife's. It was mine by promise. You promised it to me if I would go and buy it; you promised to give it to my wife; it was mine by promise and her'n by deed." And says I, "I shall not sign the deed." "Well," he says, "it is good for nothing without you do." Says I, "I have nothing to do with it; it don't belong to me; it belongs to my wife."

Mr. Davis is corroborated, to some extent, by the testimony of Samuel and Susan Izzard; the latter stated that in July or August, 1872, Mr. Warren came to Rio Grande, where Henry Davis then lived; that whilst he was there he had a conversation with him, in which he stated, that he came down to see Mrs. Davis, to get a deed for the property that Mrs. Davis held, for some property in the city; that he had an offer for

it, and thought he would come down and get the deed, and sell the property and give her the money, $3,000 ; that the money would do her more good than the property.·

The deed, it is true, was never fully delivered to Mrs. Davis, but as Warren was the active party in the purchase, the delivery to him was sufficient. The title of Steele was certainly divested as soon as the purchase money was paid and the deed passed to Warren; the title, thereafter was a matter between Warren and Mrs. Davis; she was not bound to accept it, but it is shown that she did, and she now claims, that it is in fact the absolute expression of the intent of the parties.

On the other hand, it is shown, that Warren, from the date of his purchase, held the deed in his own hands, that he entered into, and continued in the apparent, actual, uninterrupted possession and enjoyment of the property, until the time of his decease, in the year 1874 ; that in 1855 he erected upon it a carpenter shop, leased it from year to year, in his own· name, to various tenants, received the rents, kept up the repairs, paid the taxes, and to the time of his decease, never accounted, or was called upon to account, to his sister, or any other person, for the possession, or for the rents, issues and profits, which have accrued. Since the decease of William J. Warren, his widow and heir at law, the defendants below, have continued in the enjoyment of the property, and are still in the possession claiming under him.

Whether or not a trust resulted to Warren, at the time of the purchase in 1854, depends wholly upon a presumption of an intention to that effect, arising from the payment of the purchase money by him; the facts to raise this presumption are shown by parol and of course the presumption may be overcome by parol evidence of an actual intention otherwise.

If the testimony of Henry Davis is believed, the property was purchased directly for the benefit of Mrs. Davis, and the purchase money was paid, upon the footing of an express promise to that effect; under such a state of facts no presumption of a trust in his own favor could arise. This is what the court distinctly declared in the answer to the defendants' fifth point. But if the testimony on this point was not believed, or if the language employed by Warren was such as to render his purpose and meaning uncertain or ambiguous, the fact that afterwards and apparently in pursuance of the promise to convey to his sister, the property was actually conveyed to her, taken with the several declarations of Warren subsequently made, certainly tends to show that this was the settled purpose of his mind at the time. The retention of the deed, the continuity of the possession in Warren, his continued act

of ownership and control, are facts of a strongly rebutting character, but their effect was wholly for the jury.

We are of opinion that there was abundant evidence to justify the submission; the veracity of the witnesses, and the conflict in the evidence, were matters with which we have nothing to do. Upon a careful examination of the whole record, we find no error, and

The judgment is affirmed.